**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **T.M.S.** | **Case No.:** |
| **Plaintiff,** | **JUDGE:** |
| | **MAGISTRATE JUDGE:** |
| **v.** | |
| **WYNDHAM HOTELS & RESORTS, INC.; WYNDHAM HOTEL GROUP, LLC; G6 HOSPITALITY, LLC; G6 HOSPITALITY FRANCHISING, LLC; G6 HOSPITALITY PROPERTY LLC; RED LION HOTELS CORPORATION; KS & NH, INC.; DHAN, LLC; SEATAC HOTELS, LLC; ANJALI ENTERPRISE LLC.** | **Demand for Jury Trial** |
| **DOES 1-10,** | |
| **Defendants** | |

## PLAINTIFF'S COMPLAINT

### INTRODUCTION

1. Plaintiff, T.M.S., files this civil lawsuit to seek compensation for the harms and losses she sustained as a result of being a victim of sex trafficking that occurred from the years 2014 through 2020, when she was 16 through 21 years of age. For years, Plaintiff was subjected to untold atrocities, including rape, verbal and physical attacks, humiliation, fear, and sexual assault at hotels owned, operated, maintained, and controlled by the hotel defendants (and their agents and employees) named in this case.

2. Plaintiff was trafficked in hotels owned, operated, and managed by Wyndham Hotels & Resorts, Inc.; Wyndham Hotel Group, LLC; G6 Hospitality LLC; G6 Hospitality Franchising LLC; G6 Hospitality Property LLC; Red Lion Hotels Corporation; KS & NH, INC.; Dhan, LLC; SeaTac Hotels, LLC; and Anjali Enterprise LLC.

3. As discussed herein, the defendants derived a financial benefit from widespread use of their hotel properties for sex trafficking, including the trafficking of Plaintiff. Despite obvious and apparent signs of sex trafficking, these defendants continued renting hotel rooms to Plaintiff's traffickers and operated the hotels in a way that enabled sex trafficking, including by creating a haven where traffickers could operate without disruption from hotel staff and with minimal risk of detection and traceability. Thus, these defendants are civilly liable to Plaintiff pursuant to federal anti-trafficking laws and statutory remedies.

### PARTIES

4. Plaintiff is a natural person, currently 27 years of age, who is a resident and citizen of Seattle, Washington.

5. Plaintiff is a victim of trafficking pursuant to 22. U.S.C. § 7102(17) and 18 U.S.C. § 1591(a), and a victim of a "severe form of trafficking" as defined under 22 U.S.C. § 7102(16). a. Due to the sensitive and intimate nature of the issues, Plaintiff requests that

2

this Court grant a protective order pursuant to Fed. R. Civ. P. 26(c) to permit her to proceed under a pseudonym and to ensure that Defendants maintain the confidentiality of Plaintiff's identity throughout the pendency of this lawsuit and after.[1]

6. Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[2] However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[3] For good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.[4]

7. Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

8. Plaintiff should not be compelled to disclose her identity in order to maintain her privacy and safety. Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[5]

---

[1] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[2] Fed. R. Civ. P. 10(a).

[3] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See, e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); James v. Jacobson, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

[4] Fed. R. Civ. P. 26(c).

[5] *Does I thru XXII*, 214 F.3d at 1068 (joining its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

9. Moreover, Defendants will not be prejudiced. Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's personal identifying information from the public docket and assurances that Defendants will not use or publish Plaintiff's identity in a manner that will compromise her safety, personal life, personal relationships, or future employment prospects.

10. Defendant Wyndham Hotels & Resorts, Inc. is a for-profit Delaware corporation with its principal place of business in Parsippany, New Jersey. It does business in a systematic and continuous manner throughout Ohio, including this District and Division.

11. Defendant Wyndham Hotel Group, LLC is a for-profit Delaware corporation with its principal place of business in Parsippany, New Jersey. It does business in a systematic and continuous manner throughout Ohio, including this District and Division.

12. Defendant G6 Hospitality, LLC ("G6 Hospitality") is a for-profit limited liability company organized under the laws of the State of Delaware, with its principal place of business in Carrollton, Texas. G6 Hospitality is one of the largest hotel franchisors in the world and owns, operates, franchises, and/or licenses lodging facilities throughout the United States, including under the Motel 6 and Studio 6 brands. G6 Hospitality does business in a systematic and continuous manner throughout Ohio, including within this District and Division.

13. Defendant G6 Hospitality Franchising, LLC ("G6 Franchising") is a Delaware limited liability company with its principal place of business in Carrollton, Texas. G6 Franchising is responsible for franchising, licensing, and exercising control over branded lodging properties, including Motel 6 locations throughout the United States. G6 Franchising does business in a systematic and continuous manner throughout Ohio, including within this District and Division.

14. Defendant G6 Hospitality Property LLC is a Delaware limited liability company with its principal place of business in Carrollton, Texas. This entity owns and operates the Motel 6 located at 16500 International Blvd, SeaTac, Washington.

4

15. Defendant Red Lion Hotels Corporation ("RLHC"), currently doing business as RLH Corporation, is a large hotel brand. It is an American hospitality corporation that primarily engages in the franchising, management and ownership of upscale, mid-scale and economy hotels. It has almost 100,000 rooms across more than 1,500 properties in North America. Hotels with the Red Lion branding, including the one identified in this case, are RLHC brand properties.

16. Defendants KS & NH, Inc. is a Washington corporation which owned at operated the Days Inn hotel located at 34827 Pacific Hyw S., Federal Way, Washington, from 2017 – 2020, during which time Plaintiff was trafficked from this hotel.

17. Defendants Dhan, LLC, is a Washington limited liability company which owned the Days Inn from 2014 through 2016, during which time Plaintiff was trafficked.

18. Defendant SeaTac Hotels LLC is a Washington limited liability company which owned and operated the Motel 6 located at 47th Ave S, Seattle, WA 98188.

19. Defendant Anjali Enterprise LLC is a Washington limited liability company which owned and operated Red Lion Inn located at 2845 Pacific Hwy S. Des Moines, WA for the entire time that Plaintiff was trafficked at subject hotel.

20. The true names and capacities of Defendants DOES 1–10 are persons or entities whose true names, identities, and forms are currently unknown to Plaintiff. Plaintiff does allege that the principals and members of the Andrews-Ashkar defendants are responsible for the acts alleged herein, including under an alter-ego theory. Plaintiff will seek leave to amend this Complaint, as appropriate, to allege the true names and capacities of these fictitiously named Defendants when they are ascertained. Plaintiff is informed and believes, and thereupon alleges, that each of the fictitiously named Defendants DOES 1– 10 is responsible for the conduct alleged in this Complaint and that, through their conduct, these fictitiously named Defendants actually and substantially caused Plaintiff's injuries and damages.

## JURISDICTION AND VENUE

21.　　　This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA and under CAVRA.

22.　　　Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more Defendants reside in this district and because the CAVRA cause of action permits this lawsuit to be filed in any suitable United States District Court.

## SEX TRAFFICKING OVERVIEW

23.　　　Human trafficking is a widespread and heinous crime that has deeply scarred the moral fabric of society. Often referred to as modern-day slavery, it represents a severe public health crisis of epidemic proportions. This exploitation disrupts communities, drives criminal activity, and devastates countless families. Each year, millions of people are trafficked across the globe, including within and into the United States.

24.　　　One of the most harmful and destructive forms of human trafficking is sex trafficking. This involves using force, fraud, or coercion to force an individual into engaging in commercial sex acts. Even if no force, fraud, or coercion is involved, the exploitation of a minor for commercial sex is human trafficking.

25.　　　Sex trafficking represents a large part of global human trafficking and is the predominant form of transnational modern-day slavery. It is estimated that 4.8 million people are victims of sex trafficking worldwide, with the United States being the leading country in driving demand.

26.　　　Women and girls are disproportionately impacted by this modern form of involuntary servitude, making up 99% of victims in the commercial sex industry. Within the realm of sex trafficking, children are undoubtedly the most vulnerable. According to research from the Polaris Project, the average age at which sex trafficking begins is during adolescence, though disturbingly, it can start as early as infancy.

27.　　　In 2018, more than half (51.6%) of active criminal human trafficking cases in the United States involved sex trafficking of children only. According to the National Center

6

for Missing and Exploited Children, reports of suspected child sex trafficking increased by 846 percent between 2010 and 2015. A survey found that in 2015, 55 percent of minors who became victims of sex trafficking met their traffickers through a website or mobile app. Increasingly, predators use the internet and social media to identify, target, and exploit vulnerable children.

28. The harms suffered by victims of sex trafficking are profound and extensive. Victims are routinely subjected to sexual violence, physical abuse, and repeated criminal exploitation, often by multiple offenders. They are frequently forced to endure extreme physical deprivation, including inadequate food, sleep, and medical care, and are exposed to serious health risks such as HIV/AIDS, hepatitis, and substance dependency. Psychological consequences are pervasive and severe, including depression, post-traumatic stress disorder, anxiety, and persistent fear. Survivors often experience cognitive and memory impairments, engage in self-destructive behaviors, and face social marginalization that intensifies the lasting impact of their victimization.

29. Traffickers employ illicit schemes, intricate networks of corporate entities, and rapidly evolving technologies to carry out their operations. More than a decade ago, human trafficking was identified as the third-largest and fastest-growing criminal enterprise worldwide, driven by the combination of high profits and relatively low risk.

30. Human trafficking produces an estimated $150 billion in profits each year, approximately two-thirds of which stem from the sexual exploitation of trafficked individuals.

31. While traditional trafficking methods persist, online technologies now give traffickers an unprecedented ability to exploit larger numbers of victims and advertise across geographic boundaries. The rise of online exploitation has fundamentally transformed the commercial sex trade. Where buyers once had to leave their homes to engage in in-person transactions, the internet now enables remote access and anonymity. Online advertising has reshaped the commercial sex market and, in doing so, has contributed significantly to the growth of domestic sex trafficking.

32.     The exploitation of sex trafficking victims is not confined to traffickers and sex buyers alone; rather, human trafficking enterprises rely on the participation of ostensibly legitimate businesses to operate effectively. Traffickers understand that the viability of their operations often depends on access to and affiliation with mainstream commercial enterprises. When such businesses place profits above human welfare and become complicit, they facilitate continued exploitation and enable traffickers to adapt, innovate, and expand methods for profiting from the exploitation of human beings.

33.     There is little question that sex trafficking operations cannot succeed without the assistance, support, or facilitation of other business organizations. Human trafficking is therefore accurately understood as a criminal enterprise that relies on mainstream commercial partners to flourish.

34.     In recent years, traffickers have increasingly relied on a broad array of willing accomplices, including ostensibly legitimate businesses that knowingly profit from commercial relationships with trafficking ventures they know—or reasonably should know—are associated with the exploitation and misuse of human beings.

35.     Private-sector involvement in human trafficking is pervasive. Traffickers utilize lodging establishments to house victims and carry out forced commercial sex acts, rely on financial institutions to process and launder proceeds, and exploit internet and social media platforms to recruit victims and market their services. Criminal organizations also engage financial and legal entities to structure and manage their operations. Technological advancements in computing, software, and digital infrastructure further enable trafficking enterprises and enhance their profits.

36.     For decades, sex traffickers have operated openly within hotels and motels throughout the United States. Throughout this period, traffickers conducted their activities on hotel properties while major hospitality corporations failed to take reasonable action to prevent or disrupt trafficking. Instead, many hotels and motels limited their responses to nominal anti-trafficking initiatives while continuing to collect substantial profits from trafficking occurring on their premises.

37.     In fact, hotels constitute the primary locations in which sex trafficking takes place. This prevalence is not coincidental. For years, traffickers have exploited hotels as low-risk, high-profit environments. In 2014, 92 percent of reports to the Human Trafficking Hotline involved allegations of sex trafficking occurring in hotels. Moreover, hotels have been found to account for over 90 percent of the commercial sexual exploitation of children.

38.     The hotel industry, including Defendants, derives substantial profits from participation in ventures that they knew or should have known were engaged in conduct violating 18 U.S.C. § 1591(a). Such participation includes renting hotel rooms used to harbor sex trafficking victims on a recurring basis and providing internet services that traffickers utilize to advertise and solicit victims for commercial sex acts. This arrangement constitutes a mutually beneficial relationship between Defendants and traffickers, sustained by the sexual exploitation of victims.

39.     In light of the established link between hotels and sex trafficking, government agencies and nonprofit organizations, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, various state Attorney Generals, Love 146, EPCAT, among others, have undertaken extensive efforts to educate the hotel industry, regarding best practices for identifying and responding to trafficking. Indicators of sex trafficking in hotel environments are well documented, follow consistent patterns, and are readily detectable by appropriately trained personnel. Comprehensive, hotel-specific toolkits have been developed to enable staff at all levels to recognize and respond to trafficking indicators. Throughout a guest's stay—from check-in to check-out—traffickers and victims display recognizable warning signs.

40.     Industry participants have access to substantial publicly available information concerning the prevalence of human trafficking in hotel settings, including industry-focused reports prepared by organizations such as the Polaris Project.

41.     Education and training are among the most effective means of preventing and combating sexual exploitation and human trafficking. As ECPAT concluded: "The

9

hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property."

42.     This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained." In reference to hoteliers, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

43.     The well-known and pervasive relationship between sex trafficking and the hotel industry necessarily informs what Defendants knew or should have known about the trafficking of Plaintiff at Defendants' hotel.

44.     Addressing the widespread growth of human trafficking requires accountability for those who knowingly profit from participation in ventures that a reasonable person knew or should have known were engaged in human enslavement. Civil litigation, therefore, serves as a critical tool in any comprehensive approach to combating sex trafficking in America.

## STATEMENT OF FACTS

**Plaintiff was Trafficked**

45.     In 2014, when she was just 16, Plaintiff began a long period of being trafficked for commercial sex by adult man who went by the alias "AT".  She was introduced to AT while visiting California and they initially entered a romantic relationship. Over time, AT became increasingly abusive, engaging in mental, physical, and emotional abuse. He began by grooming Plaintiff into believing they needed money, and that the only way to

acquire it quickly enough would be to engage in commercial sex work with some of his own associates

46. This false romance quickly escalated into a coercive and exploitative situation in which AT forced Plaintiff to engage in commercial sex acts with large numbers of adult men in exchange for money paid to her trafficker.

47. From approximately 2014 through 2020, Plaintiff remained under AT's control. AT exercised complete domination over her through violence, threats, intimidation, and psychological coercion. When she resisted the demands of her daily sexual exploitation, AT would physically assault her, lock her in rooms, and deprive her of food. He also threatened harm to her family.

48. AT arranged for her to be advertised online on platforms such as Backpage.com.

49. Throughout the trafficking period, Plaintiff was repeatedly transported to and exploited within multiple hotel and motel properties in Washington State, including:

- Days Inn located at 34827 Pacific Highway South, Federal Way, Washington.
- Motel 6 located at 16500 International Blvd, SeaTac, Washington;
- Motel 6 located at 18900 47th Ave S, Seattle, Washington;
- Red Lion Inn located at 2845 Pacific Hwy S, Des Moines, Washington;

50. These properties were essential to the trafficking scheme. Plaintiff explained that she was systematically rotated among these locations from approximately 2014 to 2020, typically staying at one property for about a week before being moved to another. At each location, the pattern remained the same: she was required to engage in commercial sex acts with numerous men, often five to seven days per week.

51. The activity at these properties was frequent, consistent, and highly visible. There was a constant flow of adult men entering and exiting the rooms at all hours, often for short durations. Plaintiff reported that hotel staff observed this conduct and were aware of the ongoing activity yet failed to take any action to intervene or assist her. Staff interacted directly with AT, who maintained control over the rooms and the operation, while Plaintiff remained under his supervision.

52. Numerous indicators of trafficking were present, including high-volume foot traffic, repeated short-term visits by different men, cash-based transactions, and the presence of a young woman who appeared controlled and vulnerable. Despite these clear and repeated warning signs, hotel staff failed to act and instead allowed the activity to continue unabated.

53. During this period, Plaintiff was subjected to repeated sexual assault by both AT and buyers. She was also branded with a tattoo bearing AT's mark.

54. As a direct and proximate result of the trafficking, Plaintiff has suffered severe and ongoing psychological harm, including depression, anxiety, and extreme shame about her past.

55. Plaintiff also reported significant damage to her personal relationships. She does not feel safe around others, including men, and has difficulty forming or maintaining relationships.

56. The trafficking severely disrupted her education and economic opportunities. She was attending high school when the abuse began but was unable to complete her education. She has not been able to maintain stable employment due to the lasting psychological effects of the trauma. She has also experienced prolonged homelessness beginning at a young age.

57. The trafficker transported Plaintiff to rooms at these hotels for the purpose of engaging in unlawful commercial sex acts with adult men in exchange for money. Her trafficker also used the location to provide Plaintiff with drugs and alcohol. The hotel rooms were not incidental to the trafficking venture; they were essential instrumentalities that enabled buyers to access Plaintiff in a private, enclosed, and commercial setting.

58. Plaintiff was repeatedly brought to these hotels under the control of her trafficker. Plaintiff remained under constant supervision and control by her trafficker, as he observed from his vehicle. She could not move freely about the property or communicate directly with hotel staff, even though she spent weeks continuously located at a single location.

59.     The pattern was consistent and repetitive. The same type of activity occurred during multiple stays at these properties, creating a sustained and observable course of conduct indicative of sex trafficking over a period of many years.

60.     The Defendants hotels provided anonymity, minimal scrutiny, and convenient access for buyers responding to online advertisements. The layout and operation of the properties allowed a steady stream of unrelated adult men to access Plaintiff's room with little to no interference.

61.     Inside the hotel rooms, Plaintiff was compelled to engage in commercial sex acts through psychological coercion, drugs and alcohol, and emotional pressure, intimidation, and control, which was specific to her naïve expectations of a romantic partnership.

62.     Plaintiff did not consent to these acts. The hotel rooms served as the primary sites of repeated sexual assault and exploitation over an extended period of years which continued into adulthood.

63.     Defendants knew or, at a minimum, should have known that Plaintiff was being subjected to sex trafficking on their premises. Despite these red flags, rooms continued to be rented, payments were accepted, and no meaningful intervention occurred.

64.     By continuing to rent rooms under these circumstances, Defendants provided substantial assistance to the trafficking venture and financially benefited from the repeated commercial exploitation of a minor on their property.

65.     As a direct and proximate result of being trafficked as a minor at these Defendant hotel locations, Plaintiff suffered severe and lasting physical and psychological injuries. Beyond the physical harm, Plaintiff continues to suffer profound emotional trauma, psychological injury, and lasting relational damage stemming from prolonged sexual exploitation during her adolescence.

66.     There were overt and obvious signs of Plaintiff's trafficking, including the constant foot traffic of adult men coming and going, Plaintiff propping open doors (because she rarely had a room key), requesting access to rooms without identification, regular contact with house cleaning staff, and discussions related to the business being operated out of the hotels.

67.     Plaintiff exhibited clear indicators of trafficking in her interactions with her traffickers, hotel staff, and others, including a nervous and fearful demeanor; signs of paranoia and disorientation; refusal to make eye contact;; inability to move freely throughout the hotel or communicate independently; and submissive behavior, including seeking permission from her trafficker for basic needs and allowing traffickers to speak on her behalf.

68.     These indicators matched well-recognized "red flags" of human trafficking in the hotel industry and were known to each Defendant to be signs of sex trafficking in a hotel environment.

**Sex Trafficking at Wyndham properties**

69.     The problem of sex trafficking at Wyndham branded properties was sufficiently well known that, in 2011, there was a public petition with thousands of signatures to stop Wyndham hotels from supporting child sex exploitation at Wyndham properties. Although the Wyndham brand publicly committed to taking steps to stop facilitating trafficking, this promise proved empty; the Wyndham brand has been named a "major contributor to sexual exploitation" and part of the "dirty dozen list" by the National Center on Sexual Exploitation.[6]

70.     In the past twenty years, Wyndham-branded properties have been mentioned in at least two hundred criminal trafficking cases filed by the federal government.[7]

71.     Information that has become public through news stories establishes the entrenched and pervasive nature of the Wyndham Defendants' role in providing a venue where sex trafficking has continued unabated for years. Upon information and belief,

---

[6] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/ Scott McLester, Wyndham's former general counsel and chief compliance officer, wrote in an e-mail to the company's then C.E.O., Stephen Holmes, 'Even though we have been hesitant to commit to everything the [EPCAT] Code was asking for, the issue is not going away and it's starting to impact commercial relationships.' McLester added that the organization's 'concern about being 'bullied' into signing the Code is outweighed by the relative harmlessness of the Code itself.'")

[7] https://endsexualexploitation.org/wyndham/

14

Wyndham monitored news stories and online reviews for indicia of criminal activity, including sex trafficking. Examples of news stories confirm the widespread presence of sex trafficking, prostitution, and related criminal activity at Wyndham branded hotels, including:

72. In 2010, a California man was arrested for trafficking a 16-year-old victim after being spotted by law enforcement with the minor at a Wyndham property hotel in California.[8]

73. In 2011, a man was sentenced to life for child sex trafficking for requiring a minor to perform commercial sex services more than 50 times over a 14-day period at a Wyndham property hotel.[9]

74. In 2011, an MS-13 gang member was indicted for trafficking girls at a Wyndham property hotel Motel near Washington, D.C.[10]

75. In 2012, four were indicted after forcing a 24-year-old woman to engage in commercial sex at Ohio hotels, including a Wyndham property hotel.[11]

76. In 2012, a man was arrested for attempting to entice a 15-year-old girl to engage in prostitution at a Wyndham property hotel Motel in Oklahoma.[12]

77. A man was sentenced to 21 years in prison for sex trafficking his 16-year-old girlfriend starting in August 2013 at two hotels in Dallas, including a Wyndham property hotel Motel.[13]

---

[8] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/

[9] https://www.fbi.gov/jacksonville/press-releases/2011/ja011011.htm.

[10] https://www.thepublicdiscourse.com/2011/10/4034/

[11] https://www.10tv.com/article/news/crime/crime-tracker/four-indicted-first-human-trafficking-case-franklin-county/530-36f713e6-5488-4465-90c0-7eb99504a635

[12] Man faces new sex-trafficking charges, Tulsa World (Oklahoma) (March 9, 2013) https://plus.lexis.com/api/permalink/a9062ala-76b4-4811-89ab-5b0b3c877a88/?context= 1530671

[13] https://www.ice.gov/news/releases/dallas-gang-member-sentenced-21-years-federal-prison-child-sex-trafficking-conviction

78.     In 2013, a man was arrested at a Wyndham property hotel in Rhode Island and charged with trafficking a 17-year-old girl at the motel.[14]

79.     In 2013, a Wyndham property hotel motel in Massachusetts was searched and a man was charged with sex trafficking of a 17-year-old developmentally disabled girl after staying with her at that hotel.[15]

80.     In 2013, two pled guilty to sex trafficking charges after forcing a child to engage in commercial sex at Wyndham property motel in Texas.[16]

81.     In 2014, a sex trafficking task force arrested four in a Portland area sweep of a Wyndham property hotel.[17]

82.     In 2014, a man was charged in connection with a Lansing, MI-based sex trafficking ring involving four 15 to 18-year-old girls who would meet customers at the Super 8 in Lansing.[18]

83.     In 2015, a Texas man was arrested and charged with human trafficking and second-degree kidnapping after a woman said she was forced to perform sexual acts and was being held against her will at a Baton Rouge Wyndham property hotel.[19]

84.     Reviews of Wyndham branded properties, which upon information and belief the Wyndham Defendants monitored regularly, also show both the pervasiveness of sex trafficking at their branded properties and the Wyndham Defendants' knowledge of same.

85.     For example, an August 2008 review of a Wyndham branded property in Arizona states: "Woke in middle of night (2:30am) with loud party on 2nd floor with bodies

---

[14] https://turnto10.com/archive/new-details-in-ardrey-sex-trafficing-investigation
[15] https://www.cbsnews.com/news/mo-man-located-with-missing-mass-teen-charged-with-sex-trafficking-report-says/
[16] https://www.chron.com/news/article/two-plead-guilty-to-child-sex-trafficking-5000132.php
[17] https://www.pressherald.com/2014/03/03/sex_trafficking_task_force_arrests_4_in_portland_area_prostitution_sting/
[18] https://www.lansingstatejournal.com/story/news/local/2014/11/20/witnesses-face-lansing-man-charged-sex-trafficking-ring/70010754/
[19] https://www.wafb.com/story/29240032/texas-man-charged-with-human-trafficking-kidnapping-in-baton-rouge/

slamming into walls, and looked out window to see hooker and pimp making deal with another man in pickup in the parking lot."[20]

86.     A February 2010 review of a Wyndham branded property in Los Angeles, California states: "This place lacks security and there were drug dealers trying to push their products inside of the hotel. This place is Scary. The neighborhood was frightening and there were also prostitutes and homeless/addicts all over the place and renting rooms in the hotel. The desk guy looked at my friends attire (faux fur coat) and assumed he was a pimp and that we were prostitutes and seemed surprised that we had made reservations for more than one night. He kept giving us this strange smile ... icky. This place left me with a bad feeling. If you want to stay here to save a few bucks my advice is to utilize the buddy system whenever you leave your room to visit the vending machines ... after checking in for the night that is probably the only thing you will feel even moderately safe doing. eek. I can deal with scary hotels but this place is a disaster waiting to happen."[21]

87.     A June 2010 review of a Wyndham branded property in Virginia states: "The location is in a very unsafe place. There were junkies and prostitutes using the premises of the hotel."[22]

88.     A July 2010 review of a Wyndham branded property in Texas states: "After a night out parking lot full had to park under drive thur in front of hotel no other space. Number One reason to not stay here HOOKERS!!! walking the parking lot, walking the sidewalks and feeder road roads in front of Motel. All hours of the day."[23]

89.     An October 2011 review of a Wyndham branded property in Tennessee states: "Don't stay here unless you want drugs or a prostitute .... or both. There were drunks

---

[20] https://www.tripadvisor.com/ShowUserReviews-g60950-d74409-r21067299-Super_8_by_Wyndham_Tucson_Downtown_Convention_Center-Tucson_Arizona.html
[21] https://www.tripadvisor.com/ShowUserReviews-g32655-d235134-r56967752-Super_8_by_Wyndham_Hollywood_LA_Area-Los_Angeles_California.html
[22] https://www.expedia.com/Norfolk-Hotels-Super-8-By-Wyndham-Norfolk:Chesapeake-Bay.h7202.Hotel-Reviews
[23] https://www.tripadvisor.com/Hotel_Review-g30196-d109015-ReviewsSuper_8by_Wyndham_Austin_North_University_Area-Austin_Texas.html

running up the halls all night and the maid offered to have sex with my husband for money. When he refused, she then offered to sell him pills."[24]

90.        A February 2012 review of a Wyndham branded property in Florida states: "This hotel should not even be listed as a choice to stay in. Upon check, 3 rooms from me was a sexual battery crime scene. Prostitutes and drug deals were going on all over the property. The room was filthy, smelled horrible and I wouldn't even touch the bed! This hotel is a LIVE IN hotel for Prostitutes, drug dealers and gangs!!!!! DO NOT STAY HERE! !"[25]

91.        An April 2012 review of a Wyndham branded property in Texas states: "We have stayed in hotels all over the world and I have never had as terrible and frightening an experience as I had at this hotel. The place was crawling with prostitutes and seedy looking guys looking for prostitutes. We tried to stay here anyway, but the night manager started threatening us! In the end we had to call the police in order to safely leave. The police were very sympathetic, and apparently they have frequent problems with this hotel. Stay Away."[26]

92.        An October 2012 review of a Wyndham branded property in Florida states: "the last time i stayed at this super 8, a hooker approached me in the parking lot and informed you . this time there was a drug dealer in the next door room, cars coming and going all day & night a car would pull up and one person goes inside and 5 minutes later comes out. when i was checking out i told the desk clerk and the girl in the office says oh i know who that is. well if you knew about why was he still there. i will never stay there again, and i'm a loyal super 8 customer."[27]

93.        A February 2013 review of a Wyndham branded property in Minnesota states: "This hotel was disgusting. Homeless man passed out in lobby, possible prostitute hanging

---

[24] https://www.tripadvisor.com/Hotel_Review-g55138-d97967-Reviews-or165-Super_8by_Wyndham_Knoxville_Downtown_Area-Knoxville_Tennessee.html
[25] https://www.tripadvisor.ie/ShowUserReviews-g34378-d113362-r125347054-Super_8_by_Wyndham_Lantana_West_Palm_Beach-Lantana_Florida.html
[26] https://www.tripadvisor.com/ShowUserReviews-g56003-d240483-r128310734-Super_8_by_Wyndham_Houston_Brookhollow_NW-Houston_Texas.html
[27] https://www.tripadvisor.com/ShowUserReviews-g34378-d113362-r143852088-Super_8_by_Wyndham_Lantana_West_Palm_Beach-Lantana_Florida.html

out in hallway with pimp, cigarette smell, ridiculous noise level throughout night, etc. Dirty shoes in microwave, empty beer cans in fridge. I cannot express enough how terrible this place really is."[28]

94.     An April 2013 review of a Wyndham branded property in Georgia states: "The hotel was filled with prostitutes and drug dealers and I was put in the back with my children which gave me no type of security. Super 8 needs to remove their name from this building."[29]

95.     These articles and reviews are only representative examples. There are many similar articles about sex trafficking and other associated criminal activity at Wyndham hotels.

96.     Moreover, on information and belief, Defendants are aware of additional significant law enforcement activity related to trafficking at their hotels that was not reported in the media.

97.     Several reviews specific to the Days Inn, Federal Way describe the presence of drugs and sex trafficking:

- In January 2022, a customer left a review on Tripadvisor website for Days Inn Federal Way – WA saying, "Horrible experience, Do not stay at this hotel. 3 different police reports 6 days, staff even went thru personal belongs and stole medications. Human feces on the stairs outside of my room, domestic violence in the parking lot and Transients knocking on the door in the middle of the night trying to buy drugs. Worst experience ever in a hole. Stay away from this place!!"

- In September 2022, a customer left a review on Tripadvisor website for Days Inn Federal Way – WA saying, "disgusting. No single woman should ever stay here, I do not consider this a safe place to stay. Many men, several looking and definitely

---

[28] https://www.tripadvisor.com/ShowUserReviews-g43493-d247863-r153318041-Super_8_by_Wyndham_St_Cloud-Saint_Cloud_Minnesota.html
[29] https://www.tripadvisor.com/ShowUserReviews-g34856-d217054-r157802203-Super_8_by_Wyndham_Atlanta_Hartsfield_Jackson_Airport-College_Park_Georgia.html

drugged out, others just lurking. Total sketch. I followed my gut and left. Room was gross, everything super old."

**Sex Trafficking at G6 Hotels**

98.     G6's actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. They have known, since well before Plaintiff's trafficking that sex trafficking was ongoing and widespread at G6 properties.

99.     Use of G6 branded properties for sex trafficking is well known to the G6 Defendants. Motel 6 hotels are one of the five chains most frequently identified as a site of sex trafficking in federal criminal complaints.[30]

100.     Public statements of G6 confirm that they knew that sex trafficking is a problem and that they retained control over the response of their branded hotels to this problem. The G6 Defendants recognize that "[t]raffickers often use hotels and motels for sex trafficking activities due to the privacy extended to guests."[31] They also acknowledged the significant role G6 has in the three D's: deterring, detecting, and disrupting sex trafficking in their branded hotels."[32]

101.     Information that has become public through news stories establishes the entrenched and pervasive nature of G6's role in providing a venue where sex trafficking has continued unabated for years. G6 monitored news stories and online reviews for indicia of criminal activity at their branded locations, including sex trafficking. Examples of news stories confirm the widespread presence of sex trafficking, prostitution, and related criminal activity at G6 hotels:

---

[30] Sarah Meo and Louise Shelley, *Sex Trafficking and Hotels: Why there is a Need for Effective Corporate Social Responsibility* (Nov. 11, 2021), https://www.globalpolicyjournal.com/blog/11/11/2021/sex-trafficking-and-hotels-why-there-need-effective-corporate-social-responsibility
[31] *G6 HOSPITALITY ANTI-HUMAN TRAFFICKING TRAINING*, http://g6propertycollateral.com/wp-content/uploads/2020/02/G6_TheRoomNextDoor_Training_V12b_NoFacilitator.pdf
[32] *Id.*

- In late 2003, a trafficker set up a sex trafficking venture at a Motel 6 in Connecticut in which two (2) young women were sold for sex eight (8) to ten times per day.[33]

- In April 2009, a sex trafficking venture operated out of a Motel 6 in Toledo, Ohio.[34]

- In approximately September 2011, sex traffickers set up an operation at a Motel 6 in Toledo, Ohio to sell fifteen (15) and sixteen (16) year old girls for sex.[35]

- From approximately 2012 through October 2014, two (2) men engaged in a criminal sex trafficking venture of children which operated in part out of a Motel 6 in Harvey, Illinois.[36]

- In January 2012, a couple was charged with prostitution and pimping at a Studio 6 in Roswell, GA.[37]

- Police rescued an eighteen (18) year old girl from a sex trafficker in February 2012, at a Motel 6 in Portland, Oregon.[38]

- The FBI investigated and arrested several individuals in December 2012, for the victimization and human trafficking of several young women and a juvenile at a Motel 6 in Madison, Alabama.[39]

---

[33] Amy Fine Collins, Sex Trafficking of Americans: The Girls Next Door, Vanity Fair (May 2011), https://www.vanityfair.com/news/2011/05/human-trafficking-201105.

[34] Five Toledoans Indicted On Sex Trafficking Charges, ABC7Chicago.com (Nov. 7, 2010), https://abc7chicago.com/archive/7771888/.

[35] Mark Reiter, Two Toledoans Accused Of Juvenile Sex Trafficking, The Blade (Jun. 1, 2010), https://www.toledoblade.com/Courts/2012/06/02/2-Toledoans-accused-of-juvenile-sex-trafficking-1.html

[36] Press Release, U.S. Dept. of Justice, Two Aspiring Rappers Charged With Operating Sex-Trafficking Ring In Chicago And Suburbs (Jan. 15, 2016), https://www.justice.gov/usaondil/file/813771/download

[37] Couple arrested for pimping, prostitution, Appen Media (Jan. 17, 2012), https://www.appenmedia.com/public_safety/couple-arrested-for-pimping-prostitution/article_473fe798-1b3d-5c6f-b230-547e3e5c4651.html

[38] Press Release, U.S. Dept. of Justice, Tacoma Pimp Sentenced To 25 Years For Sex-Trafficking Two Victims (Nov. 20, 2013), https://www.justice.gov/usao-or/pr/tacoma-pimp-sentenced-25-years-sex-trafficking-two-victims

[39] *FBI Investigates Human Trafficking At Madison Hotel,* WHNT News 19 (Dec. 7, 2012), https://whnt.com/2012/12/07/fbi-investigates-human-trafficking-at-madison-motel/.

- The Orange County Human Trafficking Task Force busted a criminal enterprise in December 2012 that was selling women for sex out of a Motel 6 in Anaheim, California[40]

- In approximately March 2013, sex traffickers began operating a sex trafficking venture out of Motel 6 locations in Bangor and Portland, Maine.[41]

- Beginning in approximately May 2013, a fifteen (15) year old runaway was trafficked for sex out of the Motel 6 on Caton Avenue in Baltimore, Maryland.[42]

- In Richmond County, Georgia a man was arrested at a local Motel 6 in October 2013 and charged with sex trafficking of two young women.[43]

- Police investigated a sex trafficker in March 2014 and ultimately charged him for his crimes including, but not limited to, selling a seventeen (17) year old girl for sex out of a Motel 6 in Roseville, Minnesota.[44]

- In May 2014, two (2) traffickers were arrested at a Motel 6 in Monterey, California after a twenty-one (21) year old woman escaped from their captivity.[45]

---

[40]*Suspects Busted in Anaheim Sex Ring,* ABC13 Eyewitness News (Dec. 5, 2012), https://abc13.com/archive/8909784.

[41] Danielle McLean, What Drives Maine Sex Traffickers' Inhumanity, Bangor Daily News Maine Focus (Sept. 12, 2016), https://bangordailynews.com/2016/09/12/mainefocus/what-drives-maine-sex- traffickers-inhumanity

[42] Anne Kramer, Man Faces Prison Time For Sex Trafficking Baltimore Teen, WBAL News Radio (Apr. 10, 2014), https://www.wbal.com/article/106578/2/man-faces-prison-time-for-sex-trafficking-baltimore-teen.

[43] UPDATE: Man Arrested For Sex Trafficking, WRDW.com On Your Side, (Oct. 3, 2013), https://www.wrdw.com/home/headlines/Man-arrested-for-sex-trafficking-226301261.html.

[44]Man, 25, Is Accused Of Trafficking Teens, Twin Cities Pioneer Press (Jun. 5, 2014), https://www.twincities.com/2014/06/05/man-25-is-accused-of-trafficking-teens-2/

[45] Felix Cortez and Amy Larson, Monterey Police: 2 Human Sex Traffickers Arrested After Victim Escapes Motel,KSBW8 (May 9, 2014), https://ksbw.com/article/monterey-police-2-human-sex-traffickers-arrested-after-victim-escapes-motel/1054172.

- In the summer of 2014, two (2) girls ages fifteen (15) and sixteen (16) were taken from a children's shelter by a sex trafficker and trafficked out of a Motel 6 in Cutler Bay, Florida.[46]

- A Las Vegas man was charged with sex trafficking two (2) victims, including a seventeen (17) year old girl, in January 2015, out of a Motel 6 in Rapid City, Nevada.[47]

- In February 2015, two (2) men were arrested for sex trafficking a fourteen (14) year old girl at a Motel 6 in Seekonk, Rhode Island.[48]

- A married couple was indicted in June 2015, for their roles in sex trafficking minor children ages seventeen (17), sixteen (16), and fifteen (15) years old out of a Motel 6 in Everett, Washington.[49]

- In Tuscaloosa, Alabama police rescued a fourteen (14) year old girl from a Motel 6 in June 2015, and a grand jury subsequently charged her assailant with human trafficking and rape.[50]

102.     These articles represent only a limited and non-exhaustive sample. Numerous additional reports document sex trafficking and related criminal activity at G6-branded hotels. Moreover, upon information and belief, the G6 Defendants are aware of substantial additional law enforcement activity involving trafficking at their properties that was not

---

[46] David Goodhue, Next Stop For Man Accused Of Sex Trafficking 2 Teens: Federal Court, Miami Herald (Sept. 2, 2015), https://www.miamiherald.com/news/local/news-columns-blogs/deadline-miami/article33360843.html.

[47] Las Vegas Man Charged With Human Trafficking In Rapid City, Argus Leader (Jan. 17, 2015), https://www.argusleader.com/story/news/crime/2015/01/17/las- vegas-man-charged-human-trafficking-rapid-22city/21922915/.

[48] Stephen Peterson, RI Man Gets Jail In Sex-Trafficking Case Involving Seekonk Motel (Oct. 28, 2016), http://www.thesunchronicle.com/news/local_news/ri-man-gets-jail-in-sex-trafficking-case-involving-seekonk/article_d7a25494-9d21-11e6-8f94-63e5c74facb3.html.

[49] Diana Hefley, County Investigating 45 Ongoing Human Sex Trafficking Cases, HeraldNet (Jun. 26, 2015), https://www.heraldnet.com/news/county-investigating-45-ongoing-human-sex-trafficking-cases/. https://www.heraldnet.com/news/county-investigating-45-ongoing-human-sex-trafficking-cases/.

[50] https://www.tripadvisor.com/Hotel_Review-g41519-d244102-Reviews-Motel_6_Boston_North_Danvers-Danvers_Massachusetts.html

reported in the media. In total, state and federal law enforcement agencies have prosecuted several hundred traffickers, involving hundreds of victims, for sex trafficking and forced prostitution conducted at G6-branded properties.

103.	Online reviews of the Motel 6 located at 16500 International Blvd, SeaTac further highlight the conditions present:

- On 26 May 2016, a customer left a review on Tripadvisor website for Motel 6 Seattle, WA - Airport saying, "had room next to drug dealers only stayed for one night to be close to airport and car rental, didn't get any sleep, the room next to me was open and close front door all night long, I am not stupid, was drug dealers, which was right next to my door, I was even afraid to go outside as some shady characters were back and forth, told lady in office on duty next morning when I dropped off key. I will NOT be staying at a Motel 6 anytime soon, probably never will."

- On 9 September 2018, a customer left a review on Tripadvisor website for Motel 6 Seattle, WA - Airport saying, "Nix this Motel 6. Im a recent retired LTC from the US ARMY (AOC J.A.G.) and cancer patient, who stayed at this Motel 6 for a total of 10 weeks, and spent a total of $7000+ for the entire stay. Initial check-in was seemless, as Jackie was polite, helpful, and friendly. As the days/weeks progressed, I had the pleasure of meeting another exceptional staff member named Papa. He is a well-dressed, professional, courteous, friendly, and knowledgeable part of the front desk team at this location. I wish I could say the same for the rest of the motel front desk staff; at most, they are a negative reflection to not only the brand itself, but to hospitality in general. Racism, preferential treatment, fraud, drug/prostitution activity, and lack of integrity all seem to be issues caused by/exacerbated by these employees. The owner/corporate office needs to "drain the swamp" sans the aforementioned employees, and start anew. Both Papa, and Jackie would make a magnificent management pair, and a much more positive representation of the brand itself!

….I'd look elsewhere if the choice is yours, if not ... sleep with one eye open!"

- On 11 April 2020, a customer left a review on Tripadvisor website for Motel 6 Seattle, WA - Airport saying, "Wouldn't do it again. Well, I wouldn't do it again, unless I needed some drugs or a hooker. Place was nasty, lots of foot traffic all night, and one young lady offered to join me in my room for $100! I said "No Way" and talked her down to 50, had a decent time."

- On 14 April 2023, a customer left a review on Tripadvisor website for Motel 6 Seattle, WA - Airport saying, "Scariest night of my life!! By far the scariest night of my life! Sirens every 5 minutes. People doing drugs outside my door and the parking lot. NASTY NASTY bed. I wouldn't even let my DOG sleep on it. Clogged sink. Totally disgusting!! Waited until 2 am when the parking lot cleared and left as quickly as I could. Then, I saw rats as big as my dog running around. OMG! Called the manager today to explain and she refuted my claim. That's fine. Perhaps SHE should go and sleep in that nasty bed!! DO NOT STAY AT THIS DISGUSTING PLACE!!

104.    The same is true for the Motel 6 located at 18900 47th Ave S. in Seattle:

- On 3 September 2024, a customer left a review on Expedia website for Motel 6 Seattle, WA - Sea-Tac Airport South saying, "Our family had a reservation Labor Day weekend, 2024 from Friday through Sunday night. We booked this motel as it was convenient to local transportation and getting to/from downtown. Due to the sketchy clientele that hang out in the parking lot, we left a day early. Pros: this motel is conveniently located near the airport, public transportation, and shares a parking lot with a gas station/convenience, store, and coffee stand. Cons: The bathroom in our room reeked of urine. Additionally, there is a man that appears to have permanent residence at this motel that spends 24/7 sitting in his brown/tan SUV in the east parking lot. There are young women that rotate between the room(s) he is associated with and his vehicle. Perhaps there is a perfectly logical explanation for this but the behavior seems like it may be indicative of human

25

trafficking. I mentioned the situation to the office staff on Sunday and they didn't seem concerned about it. I will not ever stay at this motel again, nor will I stay at any Motel 6 chain based on what I saw this weekend."

- On 22 June 2025, a customer left a review on Expedia website for Motel 6 Seattle, WA - Sea-Tac Airport South saying, "This hotel is located in a high prostitution area. The room smelled stale of cigarettes. There was a prostitute in the lobby and people loitering in the parking lot. Inside the room is a sign posted to keep the deadbolt locked while in your room for your safety. My husband and son decided they didn't feel safe sleeping there, so they left."

- On 16 February 2026, a customer left a review on Expedia website for Motel 6 Seattle, WA - Sea-Tac Airport South saying, "This is NOT a place to stay if you want to feel safe! There is a sticker on the back of the door that states for you safety bolt the door. There are cameras every where. A car was broken into during my stay. Obvious drug use. The water pressure was amazing and the drive through coffee spot was amazing but doesn't make up for feeling unsafe and the horrible smelling room. Do not stay here"

105. News stories, online reviews, guest complaints, public statements, and law enforcement efforts establish that, at the time Jane Doe (IES) was trafficked at these two Motel 6 hotels, G6 knew or should have known:

  a. The use of G6 branded properties for sex trafficking was not limited to one location or geographic region but was a widespread problem;

  b. Commercial sex work occurring at G6 branded properties involved trafficking and compelled prostitution;

  c. G6 franchisees and hotel staff were not taking reasonable steps to deter, detect, and disrupt known or probable sex trafficking occurring at G6 hotel properties;

  d. Their efforts, if any, to stop facilitating sex trafficking in G6 branded properties were not effective; and

e. They were, by their acts and omissions, facilitating sex trafficking at G6 branded properties by providing venues where that trafficking was occurring widely and without sufficient detection or deterrence.

106. Despite the continually mounting evidence that sex trafficking at G6 branded properties was ongoing and growing, G6 did not change course. G6 chose to continue earning revenue and profits from renting out space in their hotels as a venue for trafficking

**Sex Trafficking at Red Lion**

107. The use of Red Lion properties for sex trafficking is well known to Defendant RLHC and Red Lion Franchisees. Information that has become public through news stories and online reviews establishes the entrenched and pervasive nature of Red Lion's role in providing a venue where sex trafficking has continued unabated for years.

108. Examples of news stories and online review that demonstrate the severity and pervasiveness of prostitution, sex trafficking, and other associated criminal activity at Red Lion properties, include:

- In August 2008, a woman was arrested for operating a prostitution ring within several hotels, including the Red Lion, and employing a 16-year old.[51]

- In April 2010, a 20-year-old man and two teens were charged with forcing an 18-year old girl to sell sex out of the Red Lion Inn.[52]

- In September 2011, a 31-year-old man was arrested for compelling prostitution after setting up a prostitution date for a juvenile girl at the Red Lion Hotel near the airport.[53]

---

[51] Tom McGhee, *Madam employed 16-year-old, used hotels, court papers say*, DENVER POST (Aug. 11, 2008), https://www.denverpost.com/2008/08/11/madam-employed-16-year-old-used-hotels-court-papers-say/.

[52] *Three charged with forcing teen to prostitute at Bellevue hotels*, SEATTLE PI (April 26, 2010), https://www.seattlepi.com/local/article/Three-charged-with-forcing-teen-to-prostitute-at-882161.php.

[53] *Undercover police sting nabs a pimp prostituting a juvenile girl at Red Lion Hotel, police say*, OREGONLIVE (Sept. 15, 2011), https://www.oregonlive.com/portland/2011/09/undercover_police_sting_nabs_a.html.

- In November 2013, a woman was arrested and charged with prostitution for soliciting sex at a Red Lion Hotel in Elko. Hotel staff told police they observed the woman "making her way throughout the casino speaking with several patrons within the casino as if she was propositioning people."[54]

- In April 2018, a man was arrested at the Red Lion Hotel for assaulting, robbing, and holding prostitutes against their will in a hotel room.[55]

- In August 2019, a man was arrested on federal sex trafficking charges at the Red Lion Hotel after officers monitoring online prostitution responded to a prostitution ad online[56]

109.    These are representative examples. There are many similar online new stories and reviews for Red Lion branded hotels and, on information and belief, there are additional similar reviews and other customer complaints, including for the following reviews specific to the Des Moines, Washington location:

- In July 2022, a customer left a review on Tripadvisor website for Red Lion Inn & Suites Des Moines - WA saying, "Terrifying!booked Red Lion Inn Des Moines because the rooms looked amazing online and I could use flyer miles. We were heading to a dog show and needed dog friendly rooms close to the show grounds. The room was big and the staff friendly, but the rest was truly terrifying. The hotel has 2 parking lots. The back is pretty dark and sketchy, and the front is small with narrow spaces. We were lucky to squeeze in front all nights. We were told there was security on staff from 6pm to 6am, but only

[54] Caley Cook, *Sex Solicitor sentenced to community service*, ELKO DAILY (Nov. 13, 2013), https://elkodaily.com/news/sex-solicitor-sentenced-to-community-service/article_4ffd640c-4cd4-11e3-851c-001a4b cf887a.html.

[55] *Frantic prostitute alerts Wenatchee police about her attacker; two arrested* (Apr. 6, 2018), http://www.ifiberone.com/columbia_basin/frantic-prostitute-alerts-wenatchee-police-about-her-attacker-two-arreste d/article_da4591ac-39f6-11e8-9300-e7734bfabe6c.html.

[56] *Man arrested on federal sex trafficking charges*, WYOMING TRIBUNE EAGLE (Aug. 8, 2019), https://www.wyomingnews.com/news/local_news/man-arrested-on-federal-sex-trafficking-charges/article_310a0fce -3cc3-59d7-899f-923558845803.html.

28

saw him 2 of the non busy nights.We had to walk our dogs in the back lot as there is no grass except in the back. Even in daylight, it was an experience. During our 4 day stay, we witnessed open drug use (I am not talking weed) every single day. We saw what appeared to be overt drug deals in front of the main office, as well as behind the building. People were allowing homeless/vagrants/addicts in the back door each night. There were bags of people's personal belongings in hallways outside of the doors. Several young women who appeared to be sex workers and strung out came and left frequently each day. Some of these girls were seen in the office. We witnessed one young lady dressing at about 8 am in front of the office, blocking herself with an umbrella. One girl joked with me as I entered my room that it was her room. When we arrived, there was an ashtray in the room despite it being a non smoking hotel. Our room smelled like incense and the hallway smelled of cigarettes. Our freezer was stocked with someone else's dinner (frozen corndog). There was a man who was greeted by a suspected prostitute by the back dumpster. She handed him something and then let him in the back door carrying what appeared to be a hardshell box (for gun/drugs?) She then left. Another guy was shooting some type of pellet gun at the sign in the morning. We were seriously the only non sketchy looking clients the entire weekend. The staff was very nice but were absolutely oblivious to the situation even when we told them our concerns. On a plus, the bed was comfortable and the towels were clean and fluffy. We did have to borrow pliers to adjust the AC unit and there was no turntable in the microwave. We liked the room size and bed but definitely will not be booking again."

- On 4 August 2024, a customer left a review on Expedia website for Red Lion Inn & Suites Des Moines - WA saying, "Never again. This place was as seedy as it gets. Checked into our room and it smelled horrible like cigarettes. So bad I went back to the desk and switched rooms. Second room didn't smell like cigarettes and seemed cleaner but there was no ice bucket liner and the

tissue dispenser was empty. One of the two keys didn't work. The parking lot was covered in garbage and where we had to park behind the hotel had homeless and obviously drug addicts hanging out. Looked like crack central. The evening was horrible as there were cars with load rap music blaring outside and people talking and yelling and then the motorcycles started to rev there engines up and down at 2:00 in the morning. Did not feel safe with my wife and son here at all but we just stayed locked in our room until we left early the next morning. The room was non refundable and we checked in later so decided to just ride it out. Beware of this place at all costs."

- On 25 August 2025, a customer left a review on Expedia website for Red Lion Inn & Suites Des Moines - WA saying, "First off the location is super sketchy. Someone in a run down person car unloading white sheets they look like they bought out Ross and TJmaxx. Found out later they were low on sheet. People hanging out in lobby to watch TV or charge phone that dont have a room there. Drug deals happening in the parking lot. Some guy was scoping out the inside of cars including mine. I have to find out where i can share pictures... there were ants everywhere, including inside the sheets of my bed...a hair tie that didnt belong to me inside the the bed, tub was disgusting. I went down stairs to get new sheet to remake my bed he gave me the sheet that had been bought earlier that day and told me they were brand new..upon grabbing them and walking up stairs a stench of vinegar came from them my husband told me to go get new one again...thinking about it there wansnt enough time to unpack, wash, dry and fold all the sheets..I asked the front desk guy if these were washed he said yes and I said what happened was they were sprayed with vinegar after fluffing them up in the dryer straight from the box. Staff was weird. Especially the breakfast guy..he was talking about how much he looks alot young than 53. He kept creeping on my kids too touched my 5 year old daughters hair twice. Unfortunately I chose this hotel because it was okay

priced because we drive up the night before our cruise. I would never stay there again."

- On 25 February 2026, a customer left a review on Expedia website for Red Lion Inn & Suites Des Moines - WA saying, "My husband and I stayed here for one week (Saturday–Saturday). Unfortunately, there were significant issues with cleanliness, safety, and basic hotel services. Upon arrival, there was a very strong urine odor in the room, especially in the bathroom. The smell was traced to the shower curtain. When we contacted the front desk to request a replacement, we were told no additional curtains were available and that the same one could be cleaned. Towels and bed linens were also visibly stained. While the front of the property appears well maintained, the rear of the hotel faces a run-down area. When the front parking lot is full, guests must park in the back. At night, there were individuals openly using drugs and engaging in suspicious activity in the rear parking lot, which made walking to and from the room feel unsafe. During our stay, housekeeping service was largely absent. Trash was not removed and towels were not replaced without repeated requests at the front desk. On one occasion, we were told towels might not be available. We were informed rooms are cleaned every third day; however, after five days, no housekeeping had occurred. The only service provided was the day before checkout, when trash and used towels were collected. For comparison, we moved to Motel 6, which was similarly priced, significantly cleaner, better lit, and felt much safer. We would not stay here again."

110.    Upon information and belief, Red Lion monitored both news stories and online reviews for indicia of criminal activity, including sex trafficking. Despite the mounting evidence that sex trafficking at its properties was ongoing and growing, Red Lion continued to earn revenue through conduct that it knew or should have known would continue to facilitate that trafficking.

31

111.     News stories, online reviews, guest complaints, public statements, and law enforcement efforts establish that, at the time Plaintiff was trafficked at the Des Moines Red Lion, Red Lion knew or should have known:

a.  The use of Red Lion branded properties for sex trafficking was not limited to one location or geographic region but was a widespread problem;

b.  Commercial sex work occurring at Red Lion branded properties involved trafficking and compelled prostitution;

c.  Red Lion franchisees and hotel staff were not taking reasonable steps to deter, detect, and disrupt known or probable sex trafficking occurring at Red Lion hotel properties;

d.  Their efforts, if any, to stop facilitating sex trafficking in Red Lion branded properties were not effective; and

e.  They were, by their acts and omissions, facilitating sex trafficking at Red Lion branded properties by providing venues where that trafficking was occurring widely and without sufficient detection or deterrence.

112.     Despite the continually mounting evidence that sex trafficking at Red Lion branded properties was ongoing and growing, RLHC did not change course. Red Lion chose to continue earning revenue and profits from renting out space in their hotels as a venue for trafficking

**Actual and Constructive Knowledge**

113.     At all relevant times, the defendants knew or should have known that sex trafficking was prevalent at their hotels because the trafficking occurred openly on these premises, followed well-established patterns, and presented with obvious indicators that Defendants recognized and acknowledged as signs of sex trafficking in a hotel environment.

114.     Upon information and belief, Plaintiff's trafficker, along with other traffickers, repeatedly selected these locations to conduct sex trafficking activities because their policies and practices created a favorable environment for trafficking and because hotel

32

staff routinely ignored or failed to act on clear indicators of trafficking. As a result, traffickers were able to operate with minimal effort to conceal their activities, based on an implicit understanding that their conduct would not be questioned or disrupted by the hotels.

115.     Moreover, numerous trafficking "red flags" were observed by hotel staff and management at both locations. These indicators included, among others, payment in cash or prepaid cards; unusually high volumes of men, who were not registered guests, entering and exiting rooms at all hours; extended stays despite arriving with few personal possessions; and other conduct consistent with the well-established indicators of sex trafficking described above.

116.     During the period that Plaintiff was trafficked, there were obvious signs that her trafficker was engaged in sex trafficking:

- Plaintiff's trafficker or a "buyer" would pay for the room with cash or prepaid credit cards.
- Plaintiff would appear to be with a significantly older "boyfriend" and have lower quality clothing compared to the males she was with.
- At check-in, the hotel staff observed Plaintiff exhibit evidence of being verbally threatened and emotional abuse.
- Plaintiff would have few or no personal items when checking in.
- Plaintiff would often be dropped off at the hotel by her trafficker.
- Plaintiff could be seen loitering on the property and appearing to monitor the area.
- Plaintiff had heavy foot traffic of non-hotel guests and older males coming from the room she was trafficked in.
- The "Do Not Disturb" door hanger was used very frequently.
- After Plaintiff checked out, the hotel cleaning staff noticed large amounts of sex paraphernalia, like condoms and lubricant, in the trash.
- Plaintiff prevented housekeeping staff from entering the room for regular cleaning.

117.     Other obvious signs of trafficking consistent with the modus operandi of her trafficker, which included well-known "red flags" for trafficking in a hotel.

33

118. Employees at these hotels, including management-level employees, observed or were made aware of these obvious signs of Plaintiff's trafficking while acting within the scope and course of their employment.

119. As such, the defendants knew or were willfully blind to the fact that Plaintiff was being trafficked at the subject hotels.

120. Given these obvious signs, defendants knew or should have known about the trafficking activity that resulted in the trafficking of Plaintiff.

121. The defendants also knew or should have known about the trafficking of Plaintiff based on the numerous tools through which they monitored and supervised the subject hotels.

122. If the defendants had exercised ordinary prudence in areas of operations over which they retained control or in which they directly participated, they would have detected and stopped benefiting from the illegal activities of Plaintiff's traffickers at the subject properties.

123. The hotel staff and the franchisees also facilitated widespread trafficking at the properties, including the trafficking of Plaintiff in ways including, on information and belief:

a. developing a relationship with Plaintiff's trafficker, and creating an understanding that she could operate at the hotel without risk of interference;

b. continuing to provide rooms, services, and assistance to the trafficker in the face of obvious "red flags" of trafficking of Plaintiff and other victims;

c. accommodating specific requests made by traffickers;

d. serving as lookouts for traffickers;

e. accepting bribes from the trafficker;

f. observing Plaintiff in obvious distress but continuing to provide support to her trafficker;

g. allowing "buyers" who were not registered hotel guests to freely access the hotel without requiring identification or any other method of tracking;

h. using inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

i. following a pattern or practice of failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

j. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities, but, instead, could operate without concern for detection or interference by the hotel staff;

k. providing these traffickers with the cover of a legitimate business where they could operate without having to divert significant time and resources to avoid detection or interference by hotel staff.

124. The defendants' acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including Plaintiff.

125. The defendants knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

**Wyndham Franchisor and Franchisee Relationship**

126. The Wyndham Defendants are responsible for the acts, omissions, and knowledge of all employees of the Days Inn, Federal Way, Washington and named in this suit when operating the hotels because these acts and omissions were committed in the course and scope of employment, because the Wyndham Defendants ratified these acts and omissions, and because the Wyndham Defendants failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to the Wyndham Defendants, of sex trafficking occurring at Wyndham branded locations including the subject Days Inn Federal Way, Washington.

127. Upon information and belief, the Wyndham Defendants participated directly in aspects of the operation of the Subject Days Inn that influenced whether and to what extent trafficking occurred at the hotels, including but not limited to the trafficking of Plaintiff, as follows:

a. The Wyndham Defendants have publicly assumed responsibility and control over the human trafficking response of all Wyndham properties, including the Subject Days Inn, including design and implementation of practices to prevent trafficking, safety and security procedures, employee and franchisee education, training, and response, partnership with external organizations, and advocacy;

b. The Wyndham Defendants retained control over when its branded hotels, including the Subject Days Inn, would share information with law enforcement and when law enforcement would be contacted about suspected criminal activity in Wyndham branded hotels;

c. The Wyndham Defendants retained control over the response to trafficking by creating a reporting hotline for hotel staff and franchisees to report suspected human trafficking to the Wyndham Defendants.

d. The Wyndham Defendants determined when issues should be escalated to the National Human Trafficking Hotline or law enforcement.

e. The Wyndham Defendants retained control over determining which hotels needed additional training or other resources based on a high risk of human trafficking and other related criminal activity.

f. The Wyndham Defendants expressly retained control to terminate hotel staff and/or a franchising agreement based on the response to human trafficking;

g. The Wyndham Defendants retained control, at the brand-wide level, over training on how to spot the signs of and help prevent human trafficking. The Wyndham Defendants determined whether the training is provided, when it is provided, the content of the training, how the training is delivered, who receives the training, and the consequences if someone does not participate in the training or fails to follow such training;

h.  Although they delayed making any reasonable effort to do so, the Wyndham Defendants acknowledge that they retain control to adopt requirements for franchised hotels specifically designed to prevent human trafficking and other criminal activity;

i.  The Wyndham Defendants maintain a Safety & Security Team and a Critical Incident Rapid Response Team that are charged with investigating and responding to potential criminal incidents at all Wyndham properties, including suspected trafficking incidents;

j.  The Wyndham Defendants are responsible for adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking at the Subject Days Inn;

k.  The Wyndham Defendants maintained control over all details of the terms under which franchised hotels, including the Subject Days Inn, offered internet services to customers, including dictating the software, hardware, and service provider to be used, setting all policies about use and restrictions on use, and actively collecting and monitoring guest internet usage data. The Wyndham Defendants dictated whether sites frequently used to solicit clients for sex trafficking victims would be accessible through the internet at the Subject Days Inn;

l.  The Wyndham Defendants retained control over the setting, supervision, oversight, and enforcement of detailed policies and protocol for housekeeping services at the Subject Days Inn, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services; and

m.  Wyndham Defendants collected, maintained, and analyzed detailed data regarding housekeeping services at the Subject Days Inn, including trends that would reveal patterns consistent with human trafficking.

128.  The Wyndham Defendants directly participated in and retained day-to-day control over renting rooms at the Subject Days Inn by, among other things:

a.  The Wyndham Defendants controlled all details of the guest reservation, check-in, and payment processes through management and control over all systems used for

those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

b. The Wyndham Defendants directly made reservations for rooms at the Subject Days Inn and accepted payment for those rooms through a central reservation system that they controlled and operated. The Wyndham Defendants could reserve rooms and accept payments without requiring franchisee approval or involvement;

c. The Wyndham Defendants established and maintained control over a brand-wide "do not rent" system. The Wyndham Defendants set all policies related to use of this system and dictated the day-to-day details of reservations at the Subject Days Inn through detailed policies that it established regarding use of this "do not rent" system;

d. The Wyndham Defendants controlled room rates, required discounts, mandatory fees, and a rewards program;

e. The Wyndham Defendants controlled and restricted the ability of franchisee and staff to refuse or cancel a reservation;

f. The Wyndham Defendants controlled and oversaw policies and procedures regarding check-in, payment, and identity verification procedures;

g. The Wyndham Defendants collected, retained, monitored, and analyzed detailed data about every guest who stayed at the Subject Days Inn;

h. The Wyndham Defendants established detailed policies and protocols that dictated, step-by-step, everything that would happen from the time a guest arrived at the Subject Days Inn until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room, and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in; and

i. The Wyndham Defendants required franchisees to use Wyndham's property management system, which was owned, maintained, controlled, and operated by

38

the Wyndham Defendants, for virtually all aspects of hotel operations regarding room reservations and payment.

129. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Days Inn, the Wyndham Defendants continued renting rooms to traffickers, including the rooms used to sexually exploit victims, including Plaintiff.

130. The Wyndham Defendants are vicariously liable for the acts, omissions, and knowledge Franchisee Defendant and the staff at the Subject Days Inn which are the Wyndham Defendants' actual agents or subagents.

131. The Wyndham Defendants subjected Franchisee Defendant to detailed standards and requirements regarding the operation of the Subject Days Inn through the franchising agreement, detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the Wyndham Defendants.

132. The Wyndham Defendants obscure the full extent of control they exercise over Franchisee Defendant by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that the Wyndham Defendants imposed on Franchisee Defendant:

   a. Did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee Defendant used at the Subject Days Inn Wyndham Memphis at Graceland;

   b. Covered virtually all aspects of hotel operations, including internal operating functions;

   c. Dictated the specific manner in which Franchisee Defendant and hotel staff must carry out most day-to-day functions at the Subject Days Inn Wyndham Memphis at Graceland; and

   d. Significantly exceeded what was necessary for the Wyndham Defendants to protect their registered trademarks.

133. In addition to the ways described above, upon information and belief, the Wyndham Defendants exercised and reserved the right to exercise systemic and pervasive control over

Franchisee Defendant's day-to-day operation of the Subject Days Inn including the following ways:

a. The Wyndham Defendants required Franchisee and management of the Subject Days Inn to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for the Wyndham Defendants to protect their registered trademarks;

b. The Wyndham Defendants provided training for hotel management and select hotel staff on-site at the Subject Days Inn and at locations selected by the Wyndham Defendants;

c. The Wyndham Defendants required all hotel staff to participate in training they created through an online learning platform they controlled and maintained;

d. The Wyndham Defendants controlled training provided by Franchisee to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

e. The Wyndham Defendants retained sole discretion to determine whether all training had been completed satisfactorily;

f. For certain products and services that Franchisee was required to purchase to operate the Subject Days Inn, the Wyndham Defendants designated approved vendors and prohibited Franchisee from purchasing goods and services from anyone other than an approved vendor;

g. The Wyndham Defendants required Franchisee to sign a technology agreement governing the terms under which Franchisee must procure and use technical services and software while operating the Subject Days Inn Franchisee was required to install and use certain brands, types, makes, and/or models of hardware, software, peripheral equipment, and support services to perform internal operating functions at the hotel;

h. The Wyndham Defendants set required staffing levels for the Subject Days Inn;

40

i. The Wyndham Defendants established detailed job descriptions for all positions at the Subject Days Inn and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

j. The Wyndham Defendants set requirements for the hiring process used by Franchisee and oversaw employee discipline processes and termination decisions;

k. The Wyndham Defendants provided benefits for employees of Franchisee;

l. Wyndham Defendants required Franchisee to use a customer resource management program maintained and operated by the Wyndham Defendants;

m. The Wyndham Defendants controlled channels for guests to report complaints or Provide feedback regarding the Subject Days Inn and directly participated in the response and/or supervised the response to customer complaints or other feedback.

134. The Wyndham Defendants retained the right to provide refunds or other compensation to guests and to require Franchisee to pay associated costs;

a. The Wyndham Defendants generated reports and analysis of guest complaints and online reviews for the Subject Days Inn;

b. The Wyndham Defendants required Franchisee to use a Guest Relations Application owned, operated, and maintained by the Wyndham Defendants to manage all guest data and information. The Wyndham Defendants could use the backend of this system to analyze data and generate reports;

c. The Wyndham Defendants set detailed requirements for insurance that Franchisee must purchase and retained the right to purchase insurance for Franchisee and to bill Franchisee directly for that insurance if the Wyndham Defendants determined that Franchisee has not purchased adequate insurance;

d. The Wyndham Defendants regularly audited the books and records of Franchisee;

e. The Wyndham Defendants conducted frequent and unscheduled inspections of the Subject Days Inn;

f. The Wyndham Defendants retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action

41

plans, and to take other steps up to and including termination of the franchising agreement if Franchisee violated any of the Wyndham Defendants' detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the Subject Days Inn;

g. The Wyndham Defendants controlled all marketing for the Subject Days Inn and prohibited Franchisee from maintaining any online presence unless specifically reviewed and approved by the Wyndham Defendants;

h. The Wyndham Defendants imposed detailed recordkeeping and reporting requirements on Franchisee regarding virtually all aspects of hotel operations;

i. The Wyndham Defendants supervised and controlled day-to-day operations of the Subject Days Inn through detailed information and extensive reports that they obtained through the property management system and other software systems they required Franchisee to use; and

j. The Wyndham Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

135.     Under the TVPRA, Defendants are jointly and severally liable for all damages a jury awards to Plaintiff for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking at the Subject Days Inn.

**G6 Franchisor and Franchisee Relationship (Seattle)**

136.     G6 is a franchisor of the Motel 6 brand, and Defendant SeaTac Hotels LLC was its franchisee, with the Motel 6 located at 18900 47th Ave S, Seattle, Washington being its property.

137.     It is a standard practice in the hospitality industry, followed by Defendants, for Franchisors to set exacting brand quality standards reaching everything from the temperature at which coffee shall be served, to the number of pillows that shall be placed on each bed, to the types of funds accepted, to when, where, and how guests should be greeted.

138.     Franchisors provide their branded properties with signage on and in front of the building intended to assure customers that, if they check into that hotel, they can expect an experience consistent with the standards of the parent hotel brand. The same brand is emblazoned on everything in the hotel, from the pens on the bedside table to the staff uniforms at the front desk.

139.     Defendants provide their branded properties branded name recognition, a marketing campaign, and hotel listings in the Global Distribution System and other online travel agency databases, as well as hotel locations with access to their brand-wide central reservation systems, 800 numbers, revenue management tools, brand loyalty programs, and company websites. Thus, booking and room reservations are to a large extent controlled by the G6 for its Motel 6 locations. Defendants see booking and reservation trends, including for those branded hotels where Plaintiff was trafficked

140.     Upon information and belief, G6 require its branded hotel properties to use a property management system, which is linked to its corporate network and data center, for, among other things, receiving reservations, and processing credit card transactions.

141.     Upon information and belief, per the relevant franchise agreements, G6 may enforce its brand standards by means of periodic inspections of their brand hotel locations, backed up with the ultimate threat of termination of the franchise agreement.

142.     It is further a standard practice in the hospitality industry, and therefore, upon information and belief, G6 exercises significant control over the employment decisions of their hotel locations, including the Subject Motel 6.

143.     G6 has promulgated policies, procedures, and standards governing the hiring, training, retention, and advancement of on-the-ground employees and setting their rates of pay, which together exert significant control over all employment decisions made at the individual hotel location where Plaintiff was trafficked.

144.     Under federal labor regulations, SeaTac Hotels LLC are each considered joint employers of the employees at the Seattle Motel 6.

145.     G6 exercised day-to-day control over the Motel 6 and its other brand hotels through centralized corporate systems, training, policies, and brand standards. G6

43

implements and retains brand hotel control over, including control over the Seattle Motel 6 where Plaintiff was trafficked, as either direct subsidiaries or under the terms of its franchise agreements.

146.     Upon information and belief, G6 controlled the operations of the Seattle Motel 6 through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

    a.  Requiring the Motel 6 to use G6's centralized property management, data management, and reservation and billing systems;

    b.  Gathering reports of data generated by this Motel 6, including guest information, reservations, payment, and occupancy information through G6's centralized systems;

    c.  Conducting regular quality assurance inspections and audits for compliance with franchise agreement terms and G6's rules and regulations;

    d.  Requiring this Motel 6 to purchase products through G6's e-procurement marketplace system or from approved suppliers;

    e.  Requiring the Subject Motel 6 to pay fees based of the percentage of gross room revenues;

    f.  Providing advertising requirements and standardized marketing services;

    g.  Requiring the Subject Motel 6 to use approved vendors for internet services or other requirements for cybersecurity and technology;

    h.   Requiring all fixtures, furnishings, equipment, signs, services, materials, and supplies to meet G6's strict standards and specifications;

    i.  Regulating employment policies at the Subject Motel 6, including training and orientation materials for staff;

    j.  Requiring the Subject Motel 6 to make modifications upon G6's request and to refrain from making substantial changes without G6's permission;

    k.  Regulating the rates for room rentals; and

    l.  Insurance coverage requirements

147.     G6 manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand-related policies published and communicated via property management systems with back-end management by G6.

148.     G6 controls uniform and required reservation, marketing, customer support systems, and loyalty programs at its branded hotels through national press releases, newsletters, emails, announcements on G6's website, and mentions across its corporate media channels.

149.     G6 requires the D.C. Motel 6 to use a centralized, cloud-based reservation and property management system.

150.     G6 gathers data from its customers, including names, payment information, reservation history, browsing data, and other details associated with their stay, for promotional and guest safety reasons

151.     G6 requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place, which gives G6 the ability to access, monitor, and harvest that internet data.

152.     G6 requires branded properties to comply with its corporate policies relating to Safety and Security, Codes of Conduct, Ethics, Economic, Social, Governance, and compliance with the law.

153.     G6 participated directly in aspects of the operation of the subject Motel 6 that influenced whether and to what extent trafficking occurred at the hotel, including but not limited to the trafficking of Plaintiff as follows:

   a. The G6 Defendants have publicly assumed responsibility and control over the human trafficking response of all Motel 6, including design and implementation of practices to prevent trafficking, safety and security procedures, employee and franchisee education, training, and response, partnership with external organizations, and advocacy.

b.  The G6 Defendants retained control over when its branded hotels would share information with law enforcement and when law enforcement would be contacted about suspected criminal activity in G6 branded hotels.

c.  The G6 Defendants retained control over the response to trafficking by creating a reporting hotline for hotel staff and franchisees to report suspected human trafficking to the G6 Defendants. The G6 Defendants determined when issues should be escalated to the National Human Trafficking Hotline or law enforcement.

d.  The G6 Defendants retained control over determining which hotels needed additional training or other resources based on a high risk of human trafficking and other related criminal activity.

e.  The G6 Defendants expressly retained control to terminate hotel staff and/or a franchising agreement based on the response to human trafficking.

f.  The G6 Defendants retained control, at the brand-wide level, over training on how to spot the signs of and help prevent human trafficking. The G6 Defendants determined whether the training is provided, when it is provided, the content of the training, how the training is delivered, who receives the training, and the consequences if someone does not participate in the training or fails to follow such training.

g.  Although they delayed making any reasonable effort to do so, the G6 Defendants acknowledge that they retain control to adopt requirements for franchised hotels specifically designed to prevent human trafficking and other criminal activity.

h.  The G6 Defendants maintain a Safety & Security Team and a Critical Incident Rapid Response Team that are charged with investigating and responding to potential criminal incidents at all Motel 6 and Studio 6 properties, including suspected trafficking incidents.

i.  The G6 Defendants are responsible for adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking at the subject Motel 6.

46

j. The G6 Defendants maintained control over all details of the terms under which franchised hotels, including the subject Motel 6, offered internet services to customers, including dictating the software, hardware, and service provider to be used, setting all policies about use and restrictions on use, and actively collecting and monitoring guest internet usage data. The G6 Defendants dictated whether sites frequently used to solicit clients for sex trafficking victims would be accessible through the internet at the subject Motel 6.

k. The G6 Defendants retained control over the setting, supervision, oversight, and enforcement of detailed policies and protocol for housekeeping services at the Motel 6, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services.

l. The G6 Defendants collected, maintained, and analyzed detailed data regarding housekeeping services at the subject Motel 6, including trends that would reveal patterns consistent with human trafficking.

154. G6 played a central role in renting rooms at the subject Motel 6 by, among other things:

a. The G6 Defendants controlled all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes.

b. The G6 Defendants directly made reservations for rooms at the Motel 6 and accepted payment for those rooms through a central reservation system that they controlled and operated. The G6 Defendants could reserve rooms and accept payments without requiring Franchisee approval or involvement.

c. The G6 Defendants established and maintained control over a brand-wide "do not rent" system. The G6 Defendants set all policies related to the use of this system and dictated the day-to-day details of reservations at the Motel 6 through detailed policies that it established regarding the use of this "do not rent" system.

d.  The G6 Defendants controlled room rates, required discounts, mandatory fees, and rewards programs.

e.  The G6 Defendants controlled and restricted the ability of franchisees and staff to refuse or cancel a reservation.

f.  The G6 Defendants controlled and oversaw policies and procedures regarding check-in, payment, and identity verification procedures.

g.  The G6 Defendants collected, retained, monitored, and analyzed detailed data about every guest who stayed at the subject Motel 6.

h.  The G6 Defendants established detailed policies and protocols that dictated, step-by-step, everything that would happen from the time a guest arrived at the subject Motel 6. until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room, and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in.

i.  The G6 Defendants required franchisees to use G6's property management system, which was owned, maintained, controlled, and operated by the G6 Defendants, for virtually all aspects of hotel operations regarding room reservations and payment.

j.  The G6 Defendants oversaw the do-not-rent (DNR) lists for their branded properties.

**Red Lion Franchisor and Franchisee Relationship**

155.  Franchisee Defendants are responsible for the acts, omissions, and knowledge of all employees of the subject Red Lion when operating the hotel because these acts and omissions were committed in the scope and course of employment, because Franchisee Defendants ratified these acts and omissions, and because Franchisee Defendants failed to exercise reasonable care with regard to the hiring, training, and supervision of these

48

employees given the specific risks, known to Franchisee Defendants, of human trafficking occurring in the subject Red Lion.

156. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the subject Red Lion, Franchisee Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims, including Plaintiff.

157. Franchisee Defendants knew or were willfully blind to the fact that plaintiff was being trafficked and, despite this, benefited from continued association with her traffickers by providing them with a venue in the form of hotel rooms and related services, to facilitate her trafficking.

158. Upon information and belief, Red Lion possessed and exercised the right to control Red Lion hotels, including with respect to policies, training, compliance, and day-to-day operations relevant to the prevention and detection of human trafficking.

159. Defendant RLHC and the Red Lion hotel are a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the Red Lion hotel where the Plaintiff was trafficked for sex. Defendant RLHC and the Red Lion hotel each share the common policies and practices complained of herein.

160. Defendant RLHC and the Red Lion hotel jointly employ or ratify the employment of individuals through horizontal joint employment and or vertical joint employment.

161. As an integrated enterprise and or joint employer, Defendant RLHC and the Red Lion hotel are separately and jointly responsible for compliance with all applicable laws.

162. As an integrated enterprise and or joint employer, Defendant RLHC and the Red Lion hotel are jointly and severally liable for any damages caused by employees.

163. Upon information and belief, Defendant RLHC controls a uniform and required reservation and marketing system, credit processing system, training and policy on brand standards, including any standards, or lack thereof, on human trafficking, cybersecurity, guest preferences, rewards programs, hotel furniture, amenities, food and beverage, cleanliness, or other hotel brand related policies published and communicated via property management systems with back-end management by RLHC, Wi-Fi qualifications and/or Wi-Fi qualified vendor providers, language and policy used on internet landing pages,

49

thresholds for cybersecurity, including internet access logs, filtering and/or other guest protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at the Red Lion hotel where Plaintiff was trafficked for sex.

164. Defendant RLHC maintains that it considers guest safety and security to be important and requires the hotels in its portfolio to comply with RLHC brand standards and all local, state, and federal laws.

165. Through its relationship with the Red Lion hotel where Plaintiff was trafficked and the perpetrator who trafficked Plaintiff at the Red Lion hotel while registered as a guest there. Defendant RLHC knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known had engaged in sex trafficking.

166. RLHC benefits financially from room rentals and other incidentals recognized through renting rooms at the brand property in which the Plaintiff was sex trafficked.

167. RLHC owns, supervises, and/or operates the Red Lion hotel located at 2845 Pacific Hwy S, Des Moines, Washington and failed to implement and enforce any of its own policy or policies and protect Plaintiff from being sex trafficked.

168. Defendant RLHC voluntarily assumed the responsibility to implement sufficient policies to combat the known problem of sex trafficking at its branded properties through its activities with the AHLA and other trade organizations. However, RLHC failed to implement its own policies and those recommended to it by the above-mentioned trade organization which led to the inevitable consequence of continued trafficking at its branded properties, including the trafficking of Plaintiff.[57]

169. Upon information and belief, Plaintiff alleges that RLHC implemented means in which it could monitor various reviews of prostitution, trafficking, and guest safety issues.

---

[57] *See e.g.,* https://www.bakerdonelson.com/Franchisor-Liability-for-Franchisee-Actions-09-19-2011 (if a franchisor voluntarily assumes responsibility for some aspect of the franchise operations, it may be responsible if it is negligent in doing so).

170.     Defendant RLHC knew of sex trafficking occurring on its branded hotel properties.[58] RLHC and the Red Lion hotel knew that sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. RLHC and Red Lion knew that all of this violent and criminal activity was occurring at their branded properties therefore they knew that sex trafficking was occurring at their branded properties. Yet RLHC and the Red Lion hotel allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Red Lion hotel. Specifically, RLHC and the Red Lion hotel facilitated the trafficking through its practices, policies, and procedures. RLHC and the Red Lion hotel failed to take appropriate action to prevent the trafficking of individuals for sex so that RLHC and the Red Lion hotel could continue to profit from the business that trafficking brings, including business from out-of-state.

171.     Defendant RLHC should have known of sex trafficking occurring on its branded hotel properties. RLHC and the Red Lion hotel knew that sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. RLHC and the Red Lion hotel knew that all of this violent and criminal activity was occurring at their branded properties therefore they knew that sex trafficking was occurring at their branded properties. Yet RLHC and the Red Lion hotel allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Red Lion hotel. Specifically, RLHC and the Red Lion hotel facilitated the trafficking through its practices, policies, and procedures. RLHC and the Red Lion hotel failed to take appropriate action to prevent the

---

[58] *See e.g.,* Sarah Mirk, Sen. Wyden Pitches Bill to "Beat the Pimps", PORTLAND MERCURY (Jan. 11, 2010), *available at https://www.portlandmercury.com/politics/sen-wyden-pitches-bill-to-beat-the-pimps-2084294/*

trafficking of individuals for sex so that RLHC and the Red Lion hotel could continue to profit from the business that trafficking brings, including business from out-of-state.

172. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant RLHC has repeatedly failed to stop these actions.

173. RLHC was in an agency relationship with Red Lion branded hotels offering public lodging services in the hotel. This agency relationship was created through Defendant RLHC's exercise of an ongoing and systemic right of control over Red Lion hotels by Defendant RLHC's operations, including the means and methods of how Red Lion branded hotels conducted daily business through one or more of the following actions:

    a. providing or requiring the software, hardware, and platforms where suspicious activity or other concerns could be addressed with the Brand;

    b. providing reservation platforms where payment modes, guest names, or travel habits or history, and suspicious reservations would suggest trafficking;

    c. providing new hire orientation on human rights and corporate responsibility;

    d. providing training and education to Red Lion branded hotels through webinars, seminars, conferences, and online portals;

    e. providing and controlling customer review and response platforms;

    f. hosting online bookings on Defendant RLHC's domain;

    g. requiring Red Lion branded hotels to use Defendant RLHC's customer rewards program;

    h. requiring Red Lion branded hotels to use Defendant RLHC's property management software requiring Red Lion branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

    i. providing IT support for all property management systems, owned, operated and required by RLHC;

    j. setting employee wages;

    k. making employment decisions;

l.   advertising for employment;

m.  sharing profits;

n.   standardized training methods for employees;

o.   building and maintaining the facility in a manner specified by the owner;

p.   standardized or strict rules of operation;

q.   regular inspection of the facility and operation by owner;

r.   fixing prices; or

s.   other actions that deprive Red Lion branded hotels of independence in business operations.

174.   Upon information and belief, Defendant RLHC could, and in many instances did, track and control data regarding guest preferences and other information, including physical location of guests via their internet enabled devices, guest internet activity via their Wi-Fi services, and inventory information at each branded location. All of this data and information was under Defendant RLHC's management and control and included all of the indicia of Plaintiff's trafficking. This data included the details of Plaintiff's check-in, the internet activity associated with her reservation, including access to post advertisements from the hotel, access to other online websites known for sexual exploitations, her location at the hotel which included the notable fact that she rarely, if ever, left the hotel despite extended stays, increased use of internet data due to in-room live video monitoring by her trafficker who frequently sat in the hotel lobby to book additional dates, and the spike in requests for towels and other items from inventory.

175.   An apparent agency also exists between Defendant RLHC and Red Lion hotels. Defendant RLHC held out Red Lion branded hotels to the public as possessing authority to act on its behalf. Defendant RLHC clothed the Red Lion hotels with apparent authority to act for Defendant RLHC in the following ways: by requiring the use of Red Lion signs, providing Red Lion branded stationery, requiring the use of Red Lion's website and Red Lion's mandated 1-800 toll-free number for guest reservations, and requiring the implementation of Red Lion guest rewards programs.

176.    Upon information and belief, Defendant RLHC's conduct reasonably led Plaintiff's perpetrator to believe that the Red Lion hotels had the authority it purported to have, and Plaintiff was injured as a result

177.    Given Defendant RLHC's position and authority to control the education, implementation, and direction of its branded hotels, including Red Lion branded hotels, Defendant RLHC breached its duties in the following ways:

- did not adequately distribute information to assist employees in identifying human trafficking;

- failed to mandate a process for escalating human trafficking concerns within the organization;

- failed to mandate managers, employees, or owners attend training related to human trafficking;

- failed to provide new hire orientation on human rights and corporate responsibility;

- failed to provide any or adequate training and education on human trafficking through webinars, seminars, conferences, and online portals;

- failed to develop and hold or require ongoing training sessions on human trafficking;

- failed to provide or mandate checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention;

- failed to evaluate universal reservation systems for suspicious booking activities;

- failed to evaluate anti-trafficking measures for effectiveness and make changes where necessary;

- failed to ban cash or prepaid credit cards as payment; and

- failed to filter, monitor, and block classified advertising websites known for commercial sex, such as Backpage.com and Craigslist.com, from being accessed via hotel internet service.

178.     Upon information and belief, Defendant RLHC requires its hotels to carry a certain level of Wi-Fi internet access for hotel guests through vendors that Defendant RLHC specifies and requires.[59]

179.     Upon information and belief, Defendant RLHC requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place, including those that give Defendant RLHC access to the internet data.

180.     Defendant RLHC states in its privacy policy that it collects the following categories of information from hotel guests: name and contact information, customer information including addresses and government identification documents, social media handles, financial information, purchase history and tendencies, geolocation data, audio and video data, and internet usage data, such as cookies, IP address, the type of device used, login data, browser type and version, geolocation, and other technology.[60]

181.     Defendant RLHC retains and can view internet access which may include DNS logs, IP addresses, temporary internet files or other logs reflecting wireless internet access to its hotel properties, including the type of monitoring described above.

182.     RLHC's centralized property management system also gains RLHC access to hotels guest information registration, including names, date of booking, and length of stay.

183.     Upon information and belief, Defendant RLHC can therefore see unusual or suspicious bookings, for instance, when clientele at its branded hotels is disproportionately male for same-day bookings for one-night stays, when bookings rotate somewhat uniformly throughout its branded properties, or when reservations for extended stays are requested.

184.     Upon information and belief, Defendant RLHC has the capacity to monitor and control branded property hotel guests' access through hotel Wi-Fi to certain websites.

---

[59] *See* Red Lion Preferred Vantage Vendor, *available at* https://www hotelwifi.com/red-lion-preferred-vendor/

[60] *See* https://www.redlion.com/privacy.

185. Upon information and belief, Defendant RLHC can see when branded property hotel guests are accessing sex buyer advertisements and websites through hotel Wi-Fi, including Plaintiff's advertisements on Backpage.com.

186. Upon information and belief, and contrary to ECPAT best practices, Defendant RLHC failed to block or otherwise limit access to sex buyer advertisements and websites through Wi-Fi.

187. Upon information and belief, Defendant RLHC'S ability to see disproportionately male clientele registering for short hotel stays while accessing backpage.com and other sex buyer advertisements and websites extended to the Red Lion hotel where Plaintiff was trafficked for sex.

188. Despite access to information comprising clear sex trafficking indicators, Defendant RLHC continued to permit and profit from male clientele who rented hotel rooms to buy sex, including those who bought Plaintiff.

**FIRST CAUSE OF ACTION: TVPRA**

Trafficking Victims Protection Reauthorization Act ("TVPRA")

18 U.S.C. § 1595 (against all defendants).

189. The civil remedy provision of the federal human trafficking statute is found at 18 U.S.C. § 1595, and it reads:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter123) in an appropriate district court of the United States and may recover damages and reasonable attorney's fees.

190. Thus, the federal sex trafficking statute consists of four elements: (a) the defendant knowingly benefited, (b) from participation in a venture, (c) the venture

violated the TVPRA, and (d) the defendant knew or should have known the venture violated the statute.

## Claim 1: Wyndham, KS & NH, Inc. and Dhan LLC Liability

### Knowingly Benefited

191.    The Wyndham defendants, KS & NH, Inc. and Dhan LLC knowingly benefited, financially, by renting rooms to Plaintiff's trafficker.

### Participation in a Venture

192.    The Wyndham defendants and the Days Inn owners fully participated in the commercial venture of renting rooms to Plaintiff's traffickers.

193.    Moreover, the Wyndham defendants were involved in a business venture with KS & NH, Inc. and Dhan LLC to operate a hotel and rent rooms.

### The Venture Violated the TVPRA.

194.    The commercial venture of renting rooms, including renting rooms to the Plaintiff's trafficker, violated the TVPRA by harboring the sex trafficking activities.

### Actual or Constructive Knowledge.

195.    Defendants were well aware of the prevalence of sex trafficking generally at their hotels, but nonetheless, failed to take adequate steps to prevent its occurrence. This, combined with the many pieces of evidence and signs that should have alerted it to Plaintiff's trafficking, gave the Defendant constructive, if not actual, knowledge of the sex trafficking of Plaintiff.

### Vicarious Liability

196.    The Wyndham Defendants exercise of day-to-day control over the Wyndham properties in this lawsuit, including requiring the franchisees to, among other things: (1) use its property management system; (2) use their centralized reservation system; (3) submit to periodic inspections with threat of termination; (4) gather reservation, payment,

and occupancy data through their centralized system; (5) use approved Wi-Fi and security vendors; (6) comply with their regulated room rental rates; (7) share of profits; (8) control training and policies; and (9) adhere to other brand standards and corporate policies with respect to ethics and safety, demonstrates sufficient control over the franchisee to demonstrate an agency relationship and vicarious liability for the actions of the franchisees.

**Claim 2: G6 Liability (16500 International Blvd, SeaTac, WA)**

**Knowingly Benefited**

197.     The G6 defendants knowingly benefited, financially, by renting rooms to Plaintiff's traffickers.

**Participation in a Venture**

198.     The G6 defendants fully participated in the commercial venture of renting rooms to Plaintiff's traffickers.

**The Venture Violated the TVPRA.**

199.     The commercial venture of renting rooms, including renting rooms to the Plaintiff's trafficker, violated the TVPRA by harboring the sex trafficking activities.

**Actual or Constructive Knowledge.**

200.     Defendants were well aware of the prevalence of sex trafficking generally at their hotels, but nonetheless, failed to take adequate steps to prevent its occurrence. This, combined with the many pieces of evidence and signs that should have alerted it to Plaintiff's trafficking, gave the Defendant constructive, if not actual, knowledge of the sex trafficking of Plaintiff.

**Claim 3: G6 and SeaTac Hotels LLC Liability**

**Knowingly Benefited**

201.     The G6 defendants and SeaTac Hotels LLC (Motel 6, 18900 47th Ave S owners). knowingly benefited, financially, by renting rooms to Plaintiff's traffickers

**Participation in a Venture**

202.     The G6 defendants and SeaTac Hotels LLC fully participated in the commercial venture of renting rooms to Plaintiff's traffickers.

203.     Moreover, the G6 defendants were involved in a business venture with SeaTac LLC to operate a hotel and rent rooms.

**The Venture Violated the TVPRA.**

204.     The commercial venture of renting rooms, including renting rooms to the Plaintiff's trafficker, violated the TVPRA by harboring the sex trafficking activities.

**Actual or Constructive Knowledge.**

205.     Defendants were well aware of the prevalence of sex trafficking generally at their hotels, but nonetheless, failed to take adequate steps to prevent its occurrence. This, combined with the many pieces of evidence and signs that should have alerted it to Plaintiff's trafficking, gave the Defendant constructive, if not actual, knowledge of the sex trafficking of Plaintiff.

**Vicarious Liability**

206.     The G6 Defendants exercise of day-to-day control over the Motel 6 properties in this lawsuit, including requiring the franchisees to, among other things: (1) use its property management system; (2) use their centralized reservation system; (3) submit to periodic inspections with threat of termination; (4) gather reservation, payment, and occupancy data through their centralized system; (5) use approved Wi-Fi and security vendors; (6) comply with their regulated room rental rates; (7) share of profits; (8) control training and policies; and (9) adhere to other brand standards and corporate policies with

respect to ethics and safety, demonstrates sufficient control over the franchisee to demonstrate an agency relationship and vicarious liability for the actions of the franchisees.

## Claim 4: Red Lion Hotel Corp (RLHC) and Anjali Enterprise LLC Liability

### Knowingly Benefited

207.    The Red Lion defendants and Anjali Enterprise LLC knowingly benefited, financially, by renting rooms to Plaintiff's traffickers.

### Participation in a Venture

208.    The Red Lions defendants and Anjali fully participated in the commercial venture of renting rooms to Plaintiff's traffickers.

209.    Moreover, the Red Lion defendants were involved in a business venture with Anjali LLC to operate a hotel and rent rooms.

### The Venture Violated the TVPRA.

210.    The commercial venture of renting rooms, including renting rooms to the Plaintiff's trafficker, violated the TVPRA by harboring the sex trafficking activities.

### Actual or Constructive Knowledge.

211.    Defendants were well aware of the prevalence of sex trafficking generally at their hotels, but nonetheless, failed to take adequate steps to prevent its occurrence. This, combined with the many pieces of evidence and signs that should have alerted it to Plaintiff's trafficking, gave the Defendant constructive, if not actual, knowledge of the sex trafficking of Plaintiff.

### Vicarious Liability

212.    The RLHC Defendants exercise of day-to-day control over the Red Lion properties in this lawsuit, including requiring the franchisees to, among other things: (1) use its property management system; (2) use their centralized reservation system; (3) submit to periodic inspections with threat of termination; (4) gather reservation, payment,

and occupancy data through their centralized system; (5) use approved Wi-Fi and security vendors; (6) comply with their regulated room rental rates; (7) share of profits; (8) control training and policies; and (9) adhere to other brand standards and corporate policies with respect to ethics and safety, demonstrates sufficient control over the franchisee to demonstrate an agency relationship and vicarious liability for the actions of the franchisees.

## SECOND CAUSE OF ACTION: CAVRA

Child Abuse Victims Rights Act ("CAVRA")

18 U.S.C. § 2255 (against all defendants)

213.     Federal law provides civil remedies for victims of child exploitation by way of a statute commonly referred to as "Masha's Law." The statute provides a cause of action for minors who were victims of a violation of enumerated federal laws, including 18 U.S.C. § 1591.

214.     Defendants knowingly benefited from harboring Plaintiff, pursuant to 18 U.S.C. 1591(a)(1), by providing her and her trafficker rooms in hotels that they own, operate, and oversee, under the circumstances where they knew that Plaintiff, a minor, would be engaged in commercial sex acts.

215.     Wherefore, by reason of the foregoing, Defendants are jointly and severally liable to Plaintiff for compensatory damages and for punitive damages, in the amount to be determined at trial, together with interest and costs.

## THIRD CAUSE OF ACTION: NEGLIGENCE

(against all defendants)

216.     These defendants have a heightened duty of care to invitees, such as Plaintiff, who stay at their hotels.

61

217. As alleged above, sex trafficking was a reasonably foreseeable occurrence at the defendants' hotels from their knowledge and past experiences that persons on the premises would suffer serious bodily harm as a result of being victimized by crimes perpetrated by third parties on the premises and that they should have known for more than a decade that sex trafficking runs rampant at their motels.

218. Additionally, the franchisors are vicariously liable for the negligence of its agents and franchisees.

**PRAYER FOR RELIEF**

Plaintiff prays for judgment to be entered for Plaintiff against Defendants, jointly and severally, for the actual, compensatory, and punitive damages as the evidence may show and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, attorneys' fees, and such other and further relief to which Plaintiff may show herself to be justly entitled, at law or in equity.

**JURY DEMAND**

In accordance with Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury on all the issues so triable.

By: /s/ *Penny L. Barrick*
Penny L. Barrick, (0074110)
Steven C. Babin, Jr. (0093584)
**Babin Law, LLC**
10 W Broad Street
Suite 900
Columbus, Ohio 43215
Phone: 614.761.8800
Direct: 614.372.6404
Cell: 614.747.6184
Fax: 614.706.1775
penny.barrick@babinlaws.com
steven.babin@babinlaws.com
*Counsel for Plaintiff*